137 N.J. Super. 404 (1975)
349 A.2d 122
STATE OF NEW JERSEY, PLAINTIFF,
v.
EDWARD MURPHY, ABRAHAM PRINS AND ROCCO A. SANTARSIERO, DEFENDANTS.
Superior Court of New Jersey, Law Division (Criminal).
Decided November 5, 1975.
*410 Mr. Samuel R. DeLuca for defendant Edward Murphy.
Mr. Abraham Prins, pro se (assisted by Mr. Mayer Winograd, Deputy Public Defender).
*411 Mr. Robert M. Biagiotti for defendant Rocco A. Santarsiero (Mr. Donald R. Conway, attorney).
Mr. John J. Hill, Jr., Assistant Prosecutor argued the cause for the State (Mr. James T. O'Halloran, Prosecutor of Hudson County, attorney).
THURING, J.S.C.
This is a motion by defendants to suppress judicially sanctioned telephone interceptions and evidence derived from such interceptions. A broad and multifaceted attack on the wiretap orders and their execution is launched under 18 U.S.C.A. § 2510 et seq., the "Omnibus Crime Control Act of 1968," and N.J.S.A. 2A:156A-1 et seq., the "New Jersey Wiretapping and Electronic Surveillance Control Act."
The controversy arises out of an investigation into an alleged gangland murder of Alfred Nardone in New York City on April 22, 1974. Prior to Nardone's death a wiretap of a public phone at the 78 Club in Jersey City (hereinafter club), made during a drug conspiracy investigation, uncovered evidence of a relationship between an Edward Murphy and Nardone. After Nardone's demise the police believed that if they obtained authorization to tap phones in Murphy's home, evidence connecting Murphy to the slaying would be forthcoming.
A wiretap order for Mrs. Murphy's phones was approved on July 11, 1974. During that electronic surveillance evidence of gambling operations in the New York-New Jersey area came to the fore. Additional court-authorized extensions of the Murphy interception and subsequent wiretaps on defendant Santarsiero's phone took place, resulting in the indictment of defendants for conspiracy to violate the State's gambling laws.
Defendants' attack raises several issues not previously decided by our courts. Since the legality of later electronic surveillances in this case is dependent, in part, upon the validity of preceding ones, Wong Sun v. United States, 371 *412 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1962), the court will begin its discussion with the original wiretap of the public telephone facility at the club. In aid of understanding, the issues will be set out with subheadings.

I

Did the court order to wiretap the club phone and the execution of it violate defendants' rights?
During the monitoring of the club facility from April 4, 1974 to the date Nardone died several telephone calls were intercepted between Nardone and other individuals. Several of the conversations, and particularly one between Murphy and Nardone, were relied upon in the affidavit submitted to the judge to establish probable cause for the order to tap the Murphy phones. All defendants contest the validity of the club wiretap on the ground that the overhearing of the communications of Nardone went beyond the scope of the wiretap order.
Aside from the legal sufficiency of defendants' argument the court initially observes that Prins and Santarsiero have no standing to challenge the legality of the club wiretap order and its execution. Any alleged defect in that regard is of no benefit to these two defendants since they are not "aggrieved persons" under N.J.S.A. 2A:156A-2(k). That statute defines an aggrieved person as one "who was a party to any intercepted wire or oral communication or a person against whom the interception was directed."
Prins and Santarsiero do not qualify as "parties" to any of the intercepted conversations, nor is there any evidence to indicate that either is a person "against whom" these interceptions were directed.
In Alderman v. United States, 394 U.S. 165, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969), the court was called upon to determine which persons were entitled to relief when evidence was obtained from an alleged illegal electronic eavesdropping. The Supreme Court, in reiterating the rule *413 enunciated in Jones v. United States, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960), granted standing only with regard to (1) conversations in which the accused himself participated, or (2) all conversations occurring on the accused's premises, regardless of whether he participated in the particular conversations in any way.
An aggrieved party, then, is one who has been the target of a search and seizure by electronic surveillance, and is to be distinguished from one who merely claims prejudice through the use of evidence gathered as a consequence of a search and seizure directed at someone else. State v. Cocuzza, 123 N.J. Super. 14, 24 (Law Div. 1973). In that case it was held (at 25) that a defendant "may not `vicariously' assert such personal Fourth Amendment rights of codefendants who may have been affected by the defective initial wiretap order."
Murphy, however, does have standing to attack the legality of the club wiretap since he was a party to a conversation within the meaning of N.J.S.A. 2A:156A-2(k).
Murphy contends that since no court authorization was sought to intercept the specific telephonic communications of Alfred Nardone over the public coin-operated telephone at the club, the order without naming Nardone was in violation of the Fourth Amendment to the United States Constitution. If defendant's contention is to be construed as suggesting that affidavits and court orders must particularize and identify each and every individual whose conversation is to be overheard, then it must necessarily fall of its own weight. The United States Supreme Court has recently held that 18 U.S.C.A. § 2518(1)(b), the federal counterpart of N.J.S.A. 2A:156A-12(b), requires the name of a specific person in a wiretap application only when law enforcement officials believe that such an individual is actually committing the offense for which the wiretap is sought. United States v. Kahn, 415 U.S. 143, 94 S.Ct. 977, 39 L.Ed.2d 225 (1974). Further "when there is probable cause to believe that a particular telephone is being *414 used to commit an offense but no particular person is identifiable, a wire interception order may, nevertheless, properly issue under the statute." 157, 94 S.Ct. at 985. The authority to intercept is not limited to conversations between a party named in the order and others. Rather, assuming the substance of probable cause, the conversations of everyone using the telephone may be intercepted. Accordingly, the fact that Nardone was not named in the club order does not in any way diminish the right of the State to utilize the fruits of conversations in which Nardone participated.
Murphy essentially complains of the overbreadth of the court order to tap. He alleges that the failure to name Nardone in the order to tap resulted in a virtual general warrant to intercept all calls and is illegal. By its own terms the wiretap order of the club conferred authority to intercept only communications "relating to" certain offenses. Moreover, such interceptions were authorized only at "such time when it has been established through contemporaneous physical surveillance that one or more of the principal suspects have been observed to enter the club." Such interceptions were authorized only at "such times as it be determined by the use of a first name, last name, nickname or voice identification of one of the principals." The time allowed for interception was limited from 10 A.M. to 3 A.M. In light of the above restraints and limitations imposed by the issuing judge, the wiretap order for the club interceptions was not overbroad or general on its face. The time and manner by which the order was to be executed are sufficiently specific to overcome any allegation of unfettered discretion. It can hardly be said that the executing agents were left free to seize at will every communication that came over the wire.
Murphy's reliance on Katz v. United States, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), is misplaced since in Katz the surveillance was void ab initio because of a lack of court authorization.
*415 The court therefore concludes that the club wiretap was in all respects legal and proper.

II

Are Defendants Entitled to a Plenary Hearing to Test the Sufficiency of the Affidavit Submitted to Support the Murphy Order to Wiretap?
The court now turns to the Murphy wiretap. Defendants assert the right to a plenary hearing to determine whether or not the affidavit, submitted in the application for the Murphy wiretap, contains willful, deliberate and intentional misrepresentations. Specifically, they assert that a certain communication relied upon by the affiant inaccurately describes one of the parties as Nardone. They also attack the truthfulness of the affiant's statement that phone calls between the parties continued to the date of the application for the court order to wiretap.
Among state jurisdictions there is a split of authority as to whether a defendant can attack the truth of facts set forth in an affidavit which is sufficient on its face. Note, 13 Am. Crim. L. Rev., 117, 135, n. 104. In State v. Petillo, 61 N.J. 165 (1972), in the context of a search warrant issue, our Supreme Court denied defendant the right to such plenary hearing. The court held that proof of factual assertions contained in an affidavit submitted in support of an application for a search warrant may not be controverted on a subsequent motion to suppress incriminatory evidence seized on execution of the warrant. "Once that test is met to the satisfaction of the judge, relitigation of the truth of the factual basis for issuance of the warrant should not be permitted." 61 N.J. at 174.
Based on the above, defendants' motion for a plenary hearing to determine the veracity of the allegations contained in the affidavit is denied.

*416 III

Was there probable cause for the issuance of the Murphy wiretap order?
The court order which authorized the wiretapping of Mrs. Murphy's phones was based upon an affidavit alleging probable cause to believe certain persons participating in the conspiracy to murder Al Nardone "have been and will continue to use said telephones." In testing the validity of such order the court must be satisfied that the probable cause requirements of N.J.S.A. 2A:156A-10 have been met. That statute mandates that the affidavit state facts sufficient to support a finding of probable cause to believe that (1) a crime has been or is going to be committed, and (2) conversations relating to that crime will be heard over the telephone facility sought to be tapped.
The existence of probable cause must be found within the affidavit itself. A trial judge cannot go beyond the "four corners" of the affidavit in this determination. State v. Petillo, supra at 174. Thus the information asserted therein must be examined with scrutiny, circumspection and without the benefit of hindsight.
Probable cause under the Fourth Amendment exists "where the facts and circumstances within the affiant's knowledge, and of which he has reasonably trustworthy information, are sufficient unto themselves to warrant a man of reasonable caution to believe that an offense has been or is being committed." Berger v. New York, 388 U.S. 41, 55, 87 S.Ct. 1873, 1881, 18 L.Ed.2d 1040 (1967). In assessing whether probable cause exists, the court must consider the totality of the circumstances as outlined in the affidavit, the background of information the affiant already had and his specialized experience. State v. York, 116 N.J. Super. 440, 447 (App. Div. 1971); State v. Kasabucki, 52 N.J. 110 (1968). Here the affiant sets forth at length in the affidavit his training and experience in the field of homicide investigation and, in particular, investigations of organized crime *417 related homicides. As a result of this background, affiant asserts a special familiarity with the "entire modus operandi of the organized crime execution," including "locations, types of weapons, method of inflicting wounds and apparent reasons for such executions." It is from this perspective that the reasonableness of affiant's assertion that Nardone was a victim of a gangland execution is to be assessed.
In reviewing the facts set forth in the affidavit, the specialized knowledge of the affiant must be taken into account. It must also be recognized that affiant's opinions are based on his experience and expertise in interpreting the significance of information he has obtained. His conclusions therefore are not to be taken lightly.
In reaching the issue of probable cause the court is obliged to consider the results of independent investigations which might tend to establish or corroborate prior suspicions. Spinelli v. United States, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969). On this account the court notes that the affidavit contains information obtained from the widow to the effect that Nardone had cut short his Florida vacation to be home in New Jersey on April 22, the date of his death, because "he had a big deal going." That very night Nardone informed his wife that he had to go over to New York and meet the "Irishman Eddie  the guy who had 2 heart attacks." "Eddie" was later identified from the substance of prior conversations to be defendant Murphy.
The affidavit also recounted an interview with Allie Nardone, nephew of the deceased, in which he told investigators that his uncle "was afraid of some person or persons but that the deceased did not volunteer specific reasons for fear other than money." The nephew also stated that while in Florida in April his uncle said he had to come back to this area (New York-New Jersey) to "whack a bad guy." The nephew felt that his uncle's death was a result of a "fall-out" between his uncle and former associates. He also referred to Tony Prins as his uncle's "protector" and to the fact that if Prins was out of jail his uncle would not have been killed.
*418 Incorporated in the affidavit were portions of conversations between Nardone, Murphy and Nardone's nephew Allie, overheard pursuant to the court-authorized wiretap of the club's public telephone. In these communications the deceased Nardone constantly asked about the status of the "Board," a term which the affiant believed referred to a meeting between various factions of organized crime to discuss problems and offer a defense for actions taken. Nardone expressed grave concern over an impending matter and desired the moral support of his nephew.
After a check of all toll calls made from the Murphy phones the affiant alleged that he perceived a "pattern of phone calls" to and from Murphy (who was to meet Nardone the night of his death), to and from Prins (the alleged "protector" of Nardone), and to the J & J Damiano Bar, 39th St., New York (the location of the "big guy" referred to in an earlier intercepted conversation, who had control over the "Board"). It was the opinion of the affiant that the recited pattern indicated "an interrelationship between these parties and locations" that "pertains directly to the reason for and the procurement of the murder of Al Nardone."
It was also the affiant's opinion that Nardone's actions and comments were all related to an underlying disagreement or problem he was having with someone, which disagreement was going to be the subject of the Board meeting where Nardone's presence was expected.
The court is of the opinion that the independent investigation herein dissipated enough of the ambiguities of the prior taps disclosures and sufficiently supplemented the meaning of the conversations to warrant the issuing judge's determination of probable cause.
It is clear that there exists no single element determinative of the reasonableness of the action taken. Consideration of the various factors separately shows no one factor in itself sufficient to establish probable cause. The critical telephone conversation between Nardone and Murphy is of little significance *419 when viewed independently and in its normal context. However, when interpreted in light of organized crime parlance and when combined with other circumstances it necessarily takes on greater import. Similarly, the pattern of phone calls described by the affiant indicates nothing more than an interrelationship between the parties involved. This interrelationship only becomes relevant to the murder of Nardone when viewed against a background of earlier conversations in which the deceased participated. From the totality of circumstances appearing on the face of the affidavit the court finds it reasonable to believe that (1) a crime (the murder of Nardone) had been committed and (2) conversations relating to that crime would be heard over the Murphy phones. In combination the test of probable cause is met.
In reaching its determination the court emphasizes the fact that the proofs submitted by the affiant cannot be accurately appraised without regard to the nature of the alleged crime involved and the recognized methods and devices of its commission. The assumption that elements of organized crime may somehow be involved in a gangland execution must to some extent color the reasonableness of the application.
A further aspect of some significance is the attitude to be followed by a trial court in dealing with affidavits in connection with applications for wiretap orders. Here the affiant stated his reasons for believing that criminal activity had transpired and that evidence of such would be uncovered by a wiretap. It is well settled that police officers' statements made in affidavit form to support issuance of a warrant should be interpreted and tested by the court "in a common sense way without a grudging or negative attitude." State v. Gaines, 135 N.J. Super. 240, 244 (App. Div. 1975). "The facts asserted must be tested by the practical considerations of everyday life on which reasonably prudent and experienced police officers act." State v. Kasabucki, 52 N.J. 110, 117 (1968).
Still another consideration moves the court. The standards to be applied in a review of an issuing judge's determination *420 of probable cause have been set out in State v. Kasabucki, supra. Substantial deference must be given to the initial finding of probable cause. This court's sole function is to satisfy itself that there were sufficient facts upon which the issuing judge could posit his determination of probable cause.
As expressed in Kasabucki:
Another trial judge of equal jurisdiction should regard as binding the decision of his brother that probable cause has been sufficiently shown to support a warrant, unless there was clearly no justification for that conclusion. State v. Tanzola, 83 N.J. Super. 40, 43 (App. Div. 1964). [at 117]
Even assuming that the validity of the affidavit is in doubt, "the resolution of doubtful or marginal cases in this area should be largely determined by the privilege to be accorded to warrants". State v. Gaines, supra, 135 N.J. Super. at 245; United States v. Ventresca, 380 U.S. 102, 109, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965).
In summary, the court finds that the affidavit herein satisfied the constitutional standard of probable cause for the issuance of the order authorizing the wiretap. The affidavit was a compound of information obtained from a previous court-authorized wiretap together with knowledge obtained through independent investigation which gave substance and meaning to the former in addition to providing fresh new facts. It also furnished the court with the expert opinions of an experienced officer specializing in this type of criminal activity.
Additionally, defendants challenge the Murphy wiretap order contending that the information contained in the affidavit submitted to the issuing judge was "stale." A reading of the affidavit dated July 11, 1974 clearly shows that the last informational date relied upon by the court was May 29, 1974, or 43 days prior to the order.
The requirement that an affidavit be founded upon "recent" information is based on the necessity that there *421 exist at the time the order to wiretap is issued, probable cause for believing that the facts relied upon still exist. How long a time may be permitted to elapse without destroying the basis for a reasonable belief as to the continuation of the situation set forth in the affidavit, depends upon the facts and circumstances of each case.
Defendant relies upon Hamelmann v. Florida, 113 So.2d 394 (Fla. App. 1959), for the proposition that this period is limited in all but extraordinary cases to 30 days. Hamelmann does hold (at 396) that "if the observation of the alleged offense is not further remote than 30 days from the making of the affidavit and issuance of the warrant, a finding that there exists probable cause will not be disturbed. The contrary appears where the elapsed time is more than 30 days." However, a later Florida decision, Hess v. Florida, 309 So.2d 606 (Fla. App. 1975), distinguished Hamelmann in that the prior holding is not to be taken literally when it suggests that any period exceeding 30 days renders the information stale. It should be noted that the information found to be stale in Hamelmann was 181 days old.
Generally, there is no strict rule as to the permissible number of days which may pass between the date of the last observed offense and the making of the affidavit upon which the order is based. The length of the period is necessarily affected by the nature of the unlawful activity. It is reasoned that "where the affidavit includes facts showing that the activity is of a continuous nature, the courts are likely to find probable cause even though weeks have passed since the occurrence of the facts relied upon. Conversely, where the affidavit recites an isolated violation, such as a single sale of illegal alcohol, the courts may refuse to imply the existence of probable cause although just a few days have passed." Annotation, "Search warrant: sufficiency of showing as to time of occurrence of facts relied on," 100 A.L.R.2d 525, 542 (1965). In Hess v. Florida, supra, the court noted that there is a great deal of difference between possession of consumable narcotics, as in Hamelmann, and *422 evidence of a continuing criminal business. In United States v. Harris, 482 F.2d 1115 (3 Cir.1973), the court found information supplied by an informant not to be stale where it concerned a large-scale narcotics operation, an activity which was inherently protracted and continuous.
Here the court finds that the acts alleged in the July 11, 1974 affidavit, involving what were believed to be elements of organized crime, were necessarily of an on-going nature. The 43 days that passed while the investigation continued to the date of execution of the order in no way diluted the belief or the probability that evidence of the murder would be uncovered if permission to wiretap the Murphy phones was forthcoming.
In State v. Clemente, 108 N.J. Super. 189 (App. Div. 1969), the affidavit did not disclose the dates of investigation nor did it state the date the informant gave information to the officers. The court nevertheless found (at 196) that "there [were] sufficient [facts] contained in the affidavit to satisfy the issuing magistrate that the violations of the law described in the affidavit were currently occurring and that the investigative activities of the investigating officers were likewise reasonably current".
In light of the nature of the unlawful activity alleged in the July 11 affidavit and the passage of 43 days from the last observed event set forth in the affidavit this court is unwilling to say that the issuing judge erred in determining that the period of time which elapsed in this case was reasonable.

IV

Does the Affidavit Submitted for the Murphy Wiretap Recite a Criminal Offense as Required by N.J.S.A. 2A:156A-8?
Defendants contend that the offense charged in the affidavit and order is not an offense that could be prosecuted in New Jersey thus there is noncompliance with N.J.S.A. *423 2A:156A-8. That statute authorizes electronic interception by investigative or law enforcement officers having responsibility for an investigation when such interception may provide evidence of enumerated crimes including murder or conspiracy to commit murder.
From the facts in the affidavit it is probable to believe that the alleged murder of Nardone was committed in the State of New York. However, it does not necessarily follow, as defendants contend, that any conspiracy in furtherance thereof had to be formed in New York also. To the contrary, there was probable cause to believe that an offense, i.e., the conspiracy to commit murder, was committed in the State of New Jersey. Conspiracy to commit murder is a separate and distinct crime in violation of New Jersey law. State v. Moretti, 52 N.J. 182 (1968).
The court being satisfied that the affidavit stated an offense violative of State law, it therefore need not decide whether the statute limits the enumerated crimes specifically to violations of New Jersey statutes.

V

Does Disclosure of Evidence Derived From the Club Wiretap to Out-of-State Law Enforcement Agencies Warrant Suppression?
Defendants contend that the affiant in the application for the first Murphy wiretap unlawfully revealed the contents of wiretap conversations overheard on the club wiretap to law enforcement agencies in New York City, in violation of N.J.S.A. 2A:156A-17. That statute at the time in question read, in pertinent part:
a. Any investigative or law enforcement officer who, by any means authorized by this act, has obtained knowledge of the contents of any wire or oral communication, or evidence derived therefrom, may disclose or use such contents or evidence to another investigative or law enforcement officer to the extent that such disclosure or use is appropriate to the proper performance of his official duties. [Emphasis supplied]
*424 The above provision was amended on June 30, 1975 and now reads:
a. Any investigative or law enforcement officer or other person who, by any means authorized by this act, has obtained knowledge of the contents of any wire or oral communication, or evidence derived therefrom, may disclose or use such contents or evidence to investigative or law enforcement officers of this or another state, any of its political subdivisions, or of the United States to the extent that such disclosure or use is appropriate to the proper performance of his official duties. [Emphasis supplied]
Thus, defendants, by comparing the initial and amended provisions of the statute contend that the disclosure was in violation of the act mandating suppression.
It is clear that not "every failure to comply fully with any requirement provided in Title III would render the interception of wire or oral communications `unlawful.'" United States v. Chavez, 416 U.S. 562, 574-575, 94 S.Ct. 1849, 1856, 40 L.Ed.2d 380 (1974). Additionally, counsel for defendants with candor admit that a fair reading of the statute controlling at the time of disclosure in this case clearly compels the belief that the interstate exchange of evidence by law enforcement officers was permitted even though that was not the intent of the statute. The legislative change in the statute was made to correct the misimpression of the prior wording.
Accordingly, I find no merit to defendants' contention in that the disclosure was not a material departure from the statute and was made in the reasonable belief that such disclosure was permissible in the context of the statutory language employed.

VI

Did the Failure to Name Murphy in the Initial Court Order to Wiretap His Wife's Phones Require Suppression of the Evidence?
The initial order to tap Mary Murphy's phones was issued on July 11, 1974. Subsequent extension orders to tap the *425 same phones were authorized on August 8, September 6, October 4 and November 1, 1974. Murphy's wife, the subscriber to the telephones, was the only person named in the orders. She at no time was suspected of criminal activity.
Murphy contends that he was "known" through interceptions received as a result of the club wiretap. These interceptions, it is alleged, produced probable cause to believe that he was involved in a conspiracy to commit murder or to conceal evidence of such crime, and that conversations relating thereto would be intercepted over phones in his home. Murphy therefore contends that N.J.S.A. 2A:156A-12(b) requires that he be named in the initial order to wiretap his wife's phones, and the failure to so name him mandates suppression of the evidence derived from the wiretap.
The court is satisfied from a reading of the July 11 affidavit in support of the Murphy wiretap that defendant Murphy was at that time a person known to be committing an offense and also a person specifically targeted for interception. The court next turns its attention to the consequences which attach to the failure to identify Murphy in the initial intercept order.
The grounds for suppression pertinent here are contained in N.J.S.A. 2A:156A-21 which requires exclusion of the derivative evidence where (a) the communication was unlawfully intercepted, and (b) the order of authorization is insufficient on its face.
With respect to paragraph (b), deemed more relevant to the issue in question, N.J.S.A. 2A:156A-12 sets forth the requisite information necessary in an order authorizing the interception of wire communications. As to the identification of persons whose communications are to be intercepted, paragraph (b) of subsection 12 requires that the order state "the identity of, or a particular description of, the person, if known, whose communications are to be intercepted." (Emphasis supplied). The plain import of this language requires the naming of a specific person in *426 the wiretap order, when law enforcement officials have probable cause to believe that such an individual is committing or about to commit one of the offenses specified in N.J.S.A. 2A:156A-8. An identical identification requirement appears in N.J.S.A. 2A:156A-9(c)(1) pertaining to applications for wiretap authorizations. The Legislature has imposed an unmistakable and substantive requirement which leaves no question as to when the government must specifically name the parties. "The listing of known persons is a statutory precondition to a valid intercept order." United States v. Bernstein, 509 F.2d 996, 1001 (4 Cir.1975). (Emphasis supplied). The breach of that requirement renders the order insufficient on its face and suppression of the derivative evidence follows, as a necessary consequence. United States v. Donovan, 513 F.2d 337, 341 (6 Cir.1975).
In paragraph (a) of N.J.S.A. 2A:156A-21 the words "unlawfully intercepted" have been interpreted to encompass the "failure to satisfy any of those statutory requirements that directly and substantially implement the congressional intention to limit the use of intercept procedures to those situations clearly calling for the employment of this extraordinary investigative device." United States v. Giordano, 416 U.S. 505, 527, 94 S.Ct. 1820, 1832, 40 L.Ed.2d 341 (1974). (Emphasis supplied) The identification provision of 18 U.S.C.A. § 2518(4)(a), the federal counterpart of N.J.S.A. 2A:156A-12(b), has been held to be "an important part of the statutory framework that Congress formulated for protection against the dangers of electronic surveillance." United States v. Donovan, supra, 513 F.2d at 340. It is a "procedural restraint on the use of wiretaps," id. at 340, which comports with the legislative scheme to allow highly restricted governmental interception of wire or oral communications. By requiring the court to name an individual who is the focus of governmental surveillance as a condition to the use of intercept procedures, the Legislature *427 made it possible to prevent, from the very inception, an abuse inherent in wiretapping, namely the random and indiscriminate interception of private conversations. Determined that this provision plays a "central role in the statutory scheme," Giordano, supra, 416 U.S. at 527, 94 S.Ct. at 1832, the court finds that communications obtained pursuant to an order which did not comply with its identification requirement were "unlawfully intercepted" within the meaning of N.J.S.A. 2A:156A-21(a), providing for the suppression of such materials.
There is yet another reason why strict adherence to the dictates of N.J.S.A. 2A:156A-12(b) must be enforced. The naming of the person "known" in an order to tap preserves a permanent record of the law enforcement activity and insures that the "known" person whose conversations were intercepted be made aware of such interception as required in another portion of the act. Specifically, the court refers to N.J.S.A. 2A:156A-16 which requires service of inventory on "the person named in the order or application, and such other parties to the intercepted communications as the judge may in his discretion determine. * * *" informing them of the application for wiretapping and the period in which it was carried out. "[A]ll authorized interceptions must eventually become known at least to the [named] subject." United States v. Bernstein, supra, 509 F. 2d at 1001. If a known person is not listed in the affidavit or order authorizing such wiretap, the unnamed subject has no assurance he will receive notice and may lose the benefit of the statutory requirement altogether. Such was the case here. Murphy, as well as the other defendants, although clearly implicated in criminal activities and truly the focus of the continuing investigations, but who remained unnamed in every subsequent extension order, never received formal notification and service of inventory. To prevent this very type of insolence in the enforcement of the tightly drawn wiretapping act the drafters wanted the name of the focus of the investigation *428 to be memorialized. This would insure against secret government surveillance without the knowledge of aggrieved persons and also against the circulation of unlawfully intercepted conversations to other law enforcement agencies.
As previously indicated, there were a series of extension orders issued subsequent to the original Murphy wiretap, as well as separate court-authorized wiretaps issued on Santarsiero's phones. Since the information used to support the Murphy extension orders and the Santarsiero wiretaps was culled from previous communications unlawfully intercepted, the court must order suppression of all the derivative evidence against each defendant. The proper test for determining whether later evidence is the tainted fruit of a prior illegal act was formulated in Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1962). There the Supreme Court noted that the primary consideration was:
[W]hether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint. [at 488, 83 S.Ct. at 417]
It is clear from a reading of the affidavits submitted in the application for the orders to wiretap that the affidavits were based on knowledge derived from earlier interceptions and it is equally clear that the Government has failed in the record to establish any independent source of evidence. This being so, the court must order suppression.
Accordingly, the motion to suppress all the evidence derived from the wiretapping in question except evidence derived from the club wiretap is granted.
The court, to perfect the record, now reaches issues raised by defendants but rendered moot by the court's prior holdings.

*429 (i)

Did the 30-Day, 24-Hour Wiretap Order of the Murphy Phones and Extensions Thereof Violate N.J.S.A. 2A:156A-12(f)?

Defendants contend that the continuous 24-hour wiretap of the Murphy phones for a total of 130 consecutive days is so overbroad and unrestricted as to invalidate the entire wiretap. Reliance is placed primarily on the United States Supreme Court's ruling that the New York statute, which allowed continuous electronic surveillance for 60 days, is unconstitutional. Berger v. New York, 388 U.S. 41, 87 S.Ct. 1873, 18 L.Ed.2d 1040 (1967). However, the decision in Berger was not premised solely upon the lengthy duration of the wiretap. Rather, the statute was found to be defective because it failed to provide for a sufficient description of particular crimes, persons, conversations and facilities to which the tap could be applied. These latter deficiencies are not presently asserted by defendants. Defendants' sole contention here is the unreasonableness of the length of time permitted to wiretap.
The court order authorizing the Murphy tap in this regard was drawn in conformity with the New Jersey Wiretapping and Electronic Surveillance Control Act. The order must incorporate the constitutional protections and restrictions delineated in N.J.S.A. 2A:156A-1 et seq., which statute has been held to meet the federal requirements. State v. Travis, 125 N.J. Super. 1, 6-7 (Law Div. 1973). The act has withstood constitutional challenge. State v. Christy, 112 N.J. Super. 48 (Law Div. 1970).
Pursuant to the statutory directives contained in N.J.S.A. 2A:156A-12(f), the court order specifically authorized interception for a period not to exceed 30 days. The application and the order stated that the wiretap be conducted in such a manner as to minimize and eliminate the interception of wire communications not otherwise subject to interception under the act. The order also directed that these *430 interceptions should begin and terminate as soon as practicable. The court therefore finds the order sufficiently qualified in scope to survive the constitutional challenge of overbreadth.
As to judicially authorized extensions of an original court order, the statute provides that if an interception is to continue beyond the time that the described type of communication has first been obtained, an application for an extension order must include "a particular statement of facts establishing probable cause to believe that additional circumstances of the same type will occur thereafter." N.J.S.A. 2A:156A-9(c)(5). Upon finding probable cause, the extension order shall issue. N.J.S.A. 2A:156A-12(f). Therefore, each extension of the wiretap must conform to the same procedures as that utilized in the initial application, to insure that the constitutional protections remain intact. Defendants' assertion that the wiretap endured for 130 consecutive days is thus a subtle misstatement of the facts. No wiretap order or extension thereof was ever issued which authorized electronic surveillance for a period of more than 30 days, the statutorily imposed time limit. It was not as if wiretapping was being conducted for 130 days without judicial intervention limiting the time prescribed in the statute. After each 30-day period terminated a fresh application was made to the issuing judge, and it was only after he was satisfied that "additional communications of the same type will occur" that subsequent orders were issued.
Part of defendants' constitutional attack focuses on the continuous 24-hour surveillance. In State v. Christy, supra, the defendant's claim was somewhat similar. There defendant argued invalidity on the ground that the order failed to specify the hours of interception. Here and in Christy the specter of excessive latitude given to law enforcement officers in the monitoring of telephone conversations is raised. The court in Christy responded:
The short answer to this argument is that there is no specific statutory requirement that hours be specified. * * * it might have *431 been preferable to specify an hour limitation in the order. * * * It does not follow, however that the wiretap order herein must be considered a nullity for that reason. [112 N.J. Super. at 77-78]
The only statutory restriction on duration and hours of wiretapping, besides the 30-day period in section 12(f), is contained in that same section, which states: "No order entered under this section shall authorize the interception of any wire or oral communication for a period of time in excess of that necessary under the circumstances." (Emphasis supplied) The quoted language suggests a limitation to certain hours when appropriate. As the court noted in Christy, "the term `necessary' is a flexible and relative concept. It is infused with substantive content by the basic statute and imports what is convenient, useful, appropriate, suitable, proper or conducive to the end sought, as expressed in the operative enactment." 112 N.J. Super. at 59.
The applicant for the wiretap order produced facts in support of his belief that 24-hour surveillance was necessary under the circumstances. He clearly outlined the reasoning behind his request, leaving no room for speculation on the part of the issuing judge, as complained of in State v. Sidoti, 120 N.J. Super. 208 (App. Div. 1972). Here, based on the explanations of the applicant and the other facts before him, the issuing judge was satisfied that the 24-hour-a-day request was appropriate.
The investigation arose out of an alleged organized crime homicide. Unlike a gambling inquiry where physical surveillance may reveal a limited time span in which phones are being utilized, the very nature of the investigation here demands that the hours for electronic surveillance not unduly restrict the chances of success. Organized crime is artful and deceptive in its modus operandi, carried on with a myriad of persons, and this court cannot say that the 24-hour surveillance, determined by the issuing judge to be necessary, is overly broad. In Sidoti the court stated:
[A]bsent the ability to be more specific, wiretapping orders which place the burden on police to begin and end the tap as soon as *432 practicable, and to be done in such a way as to minimize or eliminate irrelevant communications, are valid. [120 N.J. Super. at 213-214]
In Sidoti the court upheld the validity of a wiretap which did not even specify hours of interception other than to say that the tap was limited to 30 days. The court, however, went on to require a plenary hearing to determine the circumstances under which the wiretap order was executed in order to be assured that the police acted in good faith and in compliance with the order. The court feels it need not go so far as Sidoti. The broadness of the time period in Sidoti only necessitated a plenary hearing because it was combined with the fact that it was also a "special need" situation, within the meaning of N.J.S.A. 2A:156A-11, where the users of the tapped telephone, which included the general public, were not properly identified.
Such is not the case here. The telephones in question are private telephones in a private dwelling; there is no special need situation which exposed the tapped facility to the general public. The subject of the interceptions and the type of interceptions authorized are clearly stated in the application. The restrictions are set forth which govern how these interceptions are to be conducted.
In any event, the court is satisfied from the documents already before it that the order was executed in a diligent, reasonable and good faith manner, with full regard for the rights of the individuals involved and the terms of the order. A review of the supplemental affidavit submitted to the issuing judge on application for a subsequent extension supports this view. The following is contained in the affidavit:
Thus far during this investigation, the requested time period for authorization to intercept conversations has been twenty four hours a day. During this investigation, it has been determined that the subject facilities are normally used during the time period of 9:00 A.M. to midnight. In the opinion of the Affiant, this pattern should continue in the future. In view of this, and to minimize *433 the period of interceptions, it is requested that the time period for interceptions be changed to the time period of 8:00 A.M. to 2:00 A.M. the following day. [Emphasis supplied]
This request for a self-imposed minimization is indicative of the fact that the terms of the order with regard to minimization were in fact being observed in good faith by the law enforcement officers who were executing it.
Also throughout selected log papers, in numerous interceptions, the notations NP/NR or something similar appear. These symbols represent the fact that the monitor has made the good faith judgment in accordance with his training and the terms of the order that this conversation is not pertinent (NP) and therefore the monitoring was terminated and the conversation was not recorded (NR). These are examples of individual instances of minimization, again self-imposed, within the time limits of the authorized monitoring period.
The court finds against the stated background that the 30-day, 24-hour continuous surveillance and extensions thereof were reasonably determined by the issuing judge to be "necessary under the circumstances" and in no wise abused constitutional considerations.

(ii)

Did the State Illegally Attach a Touch-Tone Decoder to the Murphy Telephone?
N.J.S.A. 2A:156A-2(c) defines the term "intercept" as the "aural acquisition of the contents of any wire or oral communication through the use of any electronic, mechanical, or other device." The same provision in paragraph (d) defined "intercepting device" as "any device or apparatus that can be used to intercept a wire or oral communication". It is clear, then, that the New Jersey Wiretapping and Electronic Surveillance Control Act is limited in its application to wiretapping mechanisms designed to *434 intercept the substance of communications heard over telephone and other wire or cable facilities.
The touch-tone decoder, however, does not hear sound. It merely detects change in electrical currents, voltages and frequencies.
A decision by a federal district court in United States v. Focarile, 340 F. Supp. 1033 (D. Md. 1974), aff'd 416 U.S. 505, 94 S.Ct. 1820, 40 L.Ed.2d 341 (1974), has enlightened the court as to the mechanics and workings of the touch-tone decoder. We therefore borrow the language from that decision:
In the case of a touch tone telephone, the press of a button on the face of the phone activates an electrical oscillator, which generates two alternating electrical currents at frequencies assigned by the telephone company to correspond to the particular button pushed. The TR-12 touch tone decoder detects these electrical currents at the varying frequencies and determines the arabic number to which the various combinations of frequencies of electrical current have previously been assigned by the telephone company. The TR-12 then prints out that arabic number. [340 F. Supp. at 1040]
There is no evidence before the court that the touch-tone decoder involved herein was used or could be used for any purpose other than to record the assigned numbers of telephones to which outgoing calls were made on the Murphy phone and to record the fact that the Murphy telephone was in use. Since the touch-tone decoder does not involve the interception, acquisition or use of aural impulses, it is not the instrument by which an aural interception takes place, within the meaning of N.J.S.A. 2A: 156A-2(c) and (d).
Thus the court finds that the requirements of N.J.S.A. 2A:156A-1 et seq. have no application to the installation of a touch-tone decoder.
Although adherence to the requirements of the act is not required for the installation of a decoder, defendants nevertheless contend that the Fourth Amendment prohibits as an unreasonable search the installation of such a device *435 without the issuance of a warrant upon probable cause. In the present case the application to wiretap necessarily involved the use of means to successfully complete the effort. Furthermore, the fact that decoding mechanisms were utilized was constantly reiterated throughout the subsequent affidavits submitted in the matter. The court thus finds that the authorization given on July 11, 1974 for the Murphy wiretap included authorization to utilize the decoder as part of the wiretap facility.

(iii)

Is Suppression Required When a Defendant Does Not Receive a Copy of the Application and Order to Wiretap Until After Grand Jury Proceedings?
Defendants contend that suppression of evidence derived from the wiretaps is in order because that evidence was submitted to a grand jury prior to their receipt of a copy of the affidavit seeking authorization to wiretap and the order approving it.
N.J.S.A. 2A:156A-20 states that prior to use of the contents of any intercepted communication "in any trial, hearing or proceeding before any court of this State" a copy of the order and accompanying application must be given to the parties not less than ten days prior to such proceedings. (Emphasis supplied) It is fundamental that grand jury hearings are not court proceedings. N.J.S.A. 2A:156A-17(b) permits disclosure of wire communications "in any court * * * or before any * * * grand jury" while a person is testifying under oath, whereas there appears no mention of grand juries in N.J.S.A. 2A:156A-20. The reason for this is obvious. The latter section is a procedural section which is intended to insure that the parties receive the order and accompanying application (affidavit) in sufficient time to take the next procedural step which is governed by the following section, i.e., the motion to suppress under N.J.S.A. 2A:156A-21. N.J.S.A. 2A:156A-20 *436 does not on its face, nor was it intended to, force pre-grand jury disclosure of the order and affidavit to individuals who may or may not be future parties to the action.
Here defendants received actual notice of the wiretap well in advance of the motion to suppress to mount an informed and prepared attack upon the introduction of evidence derived from electronic surveillance. Perceiving no prejudice to defendants, the court finds no merit in this regard.
Accordingly, an appropriate order will be submitted consistent with the views herein expressed.