146 N.J. Super. 577 (1977)
370 A.2d 492
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
ANTHONY J. CIRILLO, a/k/a "33," MICHAEL J. LUKACH, a/k/a "5" AND "MICKEY," 333 CLUB, INCORPORATED, MYLES GALL, a/k/a MYLES GAUL, "SONNY" AND "JACK," MARY BABULA, FRANK L. PELUSO, a/k/a "THE SHERIFF," EUGENE ABALSAMO, a/k/a "GENE," AND NICOLA CATALDI, a/k/a "NICKEY," DEFENDANTS-APPELLANTS.
Superior Court of New Jersey, Appellate Division.
Submitted December 21, 1976.
Decided January 18, 1977.
*578 Before Judges HALPERN, BOTTER and KOLOVSKY.
Mr. Samuel DeLuca, attorney for appellants Anthony J. Cirillo, Michael J. Lukach, and The 333 Club, Inc.; Mr. Dennis McAlevy, attorney for appellant Myles Gall; Mr. Marshall Wofsy, attorney for appellant Mary Babula; Mr. Edward Zampella, attorney for appellant Frank L. Peluso; Mr. Arthur J. Abrams, attorney for appellant Eugene Abalsamo; Mr. Donald R. Conway, attorney for appellant Nicola Cataldi (Mr. Robert M. Biagiotti on the brief).
*579 Mr. Joseph C. Woodcock, Jr., Prosecutor of Bergen County, attorney for respondent (Mr. J. Dennis Kohler, Assistant Prosecutor, on the brief).
The opinion of the court was delivered by BOTTER, J.A.D.
With leave of court, defendants appeal from an order denying their motions to suppress evidence obtained as a result of telephone communications intercepted under wiretap orders purportedly entered in compliance with N.J.S.A. 2A:156A-1 et seq., the New Jersey Wiretapping and Electronic Surveillance Control Act. Defendants contend that the orders authorizing the wiretaps signed by Assignment Judge Trautwein on May 1, 1975, May 13, 1975 and May 23, 1975 failed to identify or describe, as required by N.J.S.A. 2A:156A-12(b), the person or persons whose conversations were to be intercepted.[1]
The first "Affidavit for [wiretap] Application" dated May 1, 1975 was captioned as follows:
IN THE MATTER OF INTERCEPTION OF WIRE COMMUNICATIONS OF AN INDIVIDUAL KNOWN AS ANTHONY J. CIRILLO, AND OTHER UNKNOWN PERSONS ENGAGING IN AN ILLEGAL BOOKKMAKING ENTERPRISE AND AN ILLEGAL LOTTERY ENTERPRISE FROM TELEPHONE FACILITIES (201) 945-8522, (BUSINESS PHONE) ASSIGNED TO THE 333 CLUB, 533 SHALER BOULEVARD, RIDGEFIELD, NEW JERSEY, AND (201) 945-9759 (PUBLIC PAY PHONE) ASSIGNED TO THE 333 CLUB, 533 SHALER BOULEVARD, RIDGEFIELD, NEW JERSEY.
In this affidavit Lt. Fallon recited that he received information from a reliable informant that Robert Kuhfuss of North Arlington, New Jersey, was engaged in an illegal *580 bookmaking enterprise and was accepting bets on sports and horses as well as illegal lottery over telephone facility (201) 998-6492. It was determined from telephone toll call records that in previous months 15 calls to (201) 945-8522, assigned to the 333 Club, were made from the telephone registered to Kuhfuss during "prime times for illegal gambling activity," and 17 calls were made to (201) 440-4858, a telephone assigned to J. Trotta of Ridgefield Park, New Jersey, during the same hours.
Analysis of toll calls for (201) 945-8522, listed for the 333 Club, showed 35 calls to the Kuhfuss telephone during prime gambling hours and 26 calls to (201) 423-9774 and (201) 423-0322, both assigned to the Carousel Lounge in Hawthorne, New Jersey. There were also 93 calls from the 333 Club's telephone (945-8522) to a telephone listed to Vincent M. DiPaola in the Bronx, New York, 14 calls to a pay phone at the Tik Tok Lounge in the Bronx, New York, and 19 calls to a telephone listed to Off Track Betting in New York which would give the results of horse races. Numerous calls were also made to telephones located at an apartment on Webster Avenue in Jersey City listed to a R. Meotti and Thomas Longo.
Toll call records for the telephone listed to J. Trotta, mentioned above, showed 78 calls to the telephones at the Carousel Lounge, 35 calls to Robert Kuhfuss' telephone, 37 to the telephone assigned to DiPaolo and 41 to the Meotti and Longo telephones. A check with New York City police authorities revealed that DiPaolo, whose telephone in the Bronx was called 130 times from the 333 Club and Trotta telephones, had a previous record of gambling offenses.
The Carousel Lounge was owned by Gary Latawiec who was previously investigated and arrested for a conspiracy to violate the gambling laws. Further information was obtained from a private citizen that numbers and horse bets could be placed at the 333 Club with Tony Cirillo or John Trotta and the bets would be called in from the pay phone or the business phone in the liquor store area of the 333 *581 Club. It was also reported that someone named "Chick" took bets at the 333 Club and the Ridge Tavern in Fairview. "Chick" was allegedly a partner of Charles Cappezuto, previously arrested in 1974 for illegal lottery activity. An anonymous letter received by the Bergen County Prosecutor also reported that a man named "Mickey" was taking bets at the 333 Club and used telephones 945-8522 and 945-9759.
A surveillance conducted on April 9, 1975 and April 12, 1975 at the 333 Club disclosed that Cirillo, a co-owner of 333 Club, Inc., used the telephone in the liquor store area and made an outgoing call from this telephone, but no suspicious conversation was overheard. Also, on April 12, 1975, Gary Latawiec was observed in the 333 Club and, after going into the kitchen with Cirillo, was seen receiving a telephone call on the pay phone, writing on paper for 12 minutes and receiving cash from Cirillo. Cirillo was also observed talking on a red phone in the kitchen. Someone named Peter Ferraro of Bergenfield was also observed at the bar talking to Betty the barmaid about races, horses, hits and money. He was overheard taking a numbers bet from Betty, and thereafter he left the tavern.
"Mickey" was observed on April 17, 1975 using the telephones at the 333 Club. Also, someone greeted as "Jack" and as "Trot," identified later as Trotta, entered the 333 Club on April 17, 1975. He was joined by Ferraro, who was greeted as "Willie," and by "Mickey." Someone named "Vince" also entered the bar, discussed horses with Ferraro and gave money to "Mickey."
An unidentified male spoke to Cirillo at the tavern on April 18, 1975 and Cirillo was overheard saying, "I thought I paid him. I'll have to check the book."
On April 18, 1975 Latawiec was observed at the bar talking to Cirillo but he was not seen using the telephones. The next day an unidentified patron was seen speaking to Mickey at the tavern, and both were seen using the pay phone. The patron was overheard saying that he had "$200 on the [basketball] game."
*582 On April 20, 1975 the telephones at the 333 Club rang a number of times and were answered by Cirillo, the bartender, named Joe, and a young patron. Latawiec was also observed using the pay phone that day and was seen writing while on the telephone for 15 minutes.
Mickey was identified as Michael Lukach of North Bergen. He had been arrested previously, but not for gambling offenses. The investigation also revealed that the telephone bill at the Carousel Lounge in Hawthorne was paid by G. Latawiec.
Toll call records for the 423-0322 telephone at the Carousel Lounge revealed numerous calls to a telephone at 419 Monroe Street, Hoboken, listed to a Dennis Hoch. On March 14, 1975 a Robert Schuler was arrested at that address for gambling activity as the result of a wiretap conducted by the Bergen County Prosecutor's office. Telephone calls had also been made from the 423-0322 telephone to Robert Schuler at a 944-0283 number in Palisades Park which was the subject of a previous wiretap for gambling activity.
The affidavit concluded that Cirillo, Lukach, Ferraro and Trotta were engaged in a conspiracy to violate the gambling laws and that the telephones at the 333 Club were used for this purpose, although the contents of the conversations on those telephones were unknown. It was noted that toll calls from the pay phone could not be analyzed because the user pays for those calls when they are made and they are not recorded by the telephone company.
The "Affidavit of Application" sought an order authorizing the wiretap of the two telephone facilities at the 333 Club for a 15 day period from 11 A.M. to 4 P.M. and 6 P.M. to 8 P.M., seven days a week. Two separate orders were entered on May 1, 1975 authorizing the interception of telephone wire communications to and from the two telephones at the 333 Club premises. The captions of the orders were similar to the caption of the "Affidavit of Application" quoted above. The captions clearly identified Anthony J. *583 Cirillo as a person whose conversation was to be intercepted. The orders recited that there is probable cause to believe that a criminal conspiracy to violate the gambling laws was being conducted by persons at the 333 Club and that communications concerning the aforesaid illegal activities of such persons, "whose true identity is unknown," may be obtained through interception of wire communications to and from the telephone facilities at the 333 Club.
Lt. Fallon filed another "Affidavit of Application" with Judge Trautwein on May 13, 1975, and an order was entered on that date authorizing the wiretap of telephone (201) 941-1647 listed to defendant Gall. The caption of the order is:
IN THE MATTER OF INTERCEPTION OF WIRE COMMUNICATIONS TO AND FROM A TELEPHONE FACILITY BEARING TELEPHONE NUMBER (201) 941-1647, REGISTERED TO M. GALL, 37 LINCOLN AVE., CLIFFSIDE PARK, NEW JERSEY.
That application sought to intercept telephonic communications of Myles C. Gall and other unknown persons making calls to and from 941-1647, a telephone located in the attic of a house at 37 Lincoln Avenue, Cliffside Park. It also recited that no previous applications for a wiretap of communications using these facilities were known to the applicant except for the wiretaps at the 333 Club. The application was based in part on intercepted conversations from the telephones at the 333 Club to the Gall telephone, involving persons identified as "#5" and as "Jack," in which numbers bets were reported. A call to the Gall telephone was answered by someone who identified himself as Jack. A vehicle registered to Gall was parked in front of 37 Lincoln Avenue, Cliffside Park at relevant times. The application concluded that Myles C. Gall and other unknown males are conducting a gambling operation through the use of Gall's telephone. The wiretap order of 941-1647 authorized interception of communications of persons calling to and from that telephone. *584 It recited that the "true identity" of the persons making such communications is unknown.
As a result of the wiretap on the Gall telephone a similar application was made on May 23, 1975 to wiretap another telephone, and the order of that date was captioned:
IN THE MATTER OF INTERCEPTION OF WIRE COMMUNICATIONS TO AND FROM A TELEPHONE FACILITY BEARING TELEPHONE NUMBER (201) 867-4130 REGISTERED TO MRS. J. MUSTO, 708 PALISADES AVE., UNION CITY, NEW JERSEY.
The application recited that on May 15, 1975 a male identified as "Sonny" called 867-4130 from the Gall telephone and reported horse bets and discussed numbers and sports bets. The telephone 867-4130 was answered on several occasions by an unknown male who received sports and horse bets from Sonny. However, the record of outgoing toll calls from 867-4130 did not show a pattern indicative of gambling activity, suggesting that the telephone was used solely for receiving gambling bets.
A surveillance at 708 Palisade Avenue on May 20 and 21, 1975 revealed that a white male, described as 5'9" in height, 165 pounds and grey hair, estimated to be in his 50's, entered the basement of the house from a doorway in the alley. The wiretap order recited that the person using 867-4130 was unknown.
On May 29, 1975 Investigator Berman applied for a warrant to search the premises at 708 Palisade Avenue, Union City, New Jersey, the person of Nicola A. Cataldi, described as a white male, 5'7" in height, 140-160 pounds, grey hair, born in April 1921 (age 54), and a specified motor vehicle used by Cataldi in going to the house under surveillance. The vehicle was registered to Cataldi, and his appearance corresponds to his description on motor vehicle records. The affidavit supporting the search warrant also recited evidence implicating defendants Cirillo, Lukach, Gall, Mary Babula, Frank Peluso and Eugene Abalsamo, as well as others, obtained *585 through the authorized wiretaps. Eventually, all defendants were charged in a 26-count indictment with various violations of the gambling laws, N.J.S.A. 2A:121-3 and N.J.S.A. 2A:112-3, namely, working for a lottery, unlawful possession of lottery slips, making book on sport contests and horse races, and maintaining a gambling place, as well as conspiracy (N.J.S.A. 2A:98-1 and N.J.S.A. 2A:98-2) to violate the gambling laws.
Appellants contend that the wiretap orders did not comply with N.J.S.A. 2A:156A-12(b). N.J.S.A. 2A:156A-12 provides:
Each order authorizing the interception of any wire or oral communication shall state:

* * * * * * * *
b. The identity of, or a particular description of, the person, if known, whose communications are to be intercepted; * * *
At the time the order was entered authorizing the wiretap of the telephone listed to Mrs. J. Musto at 708 Palisade Avenue, Union City, New Jersey, the identity of Nicola Cataldi was not known. Although a person fitting his description was seen entering the premises it was also not known at that time, although it was suspected, that he was, in fact, using the telephone at that location. As a result of the wiretap on the Gall telephone it was only known that a male using telephone 867-4130 received gambling bets from someone called "Sonny." Thus, the failure to name or describe Cataldi in the May 23rd wiretap order for the Musto telephone did not violate N.J.S.A. 2A:156A-12(b).
Cataldi and the other defendants contend, however, that the previous orders authorizing the wiretaps of the 333 Club and Gall telephones are deficient because the persons whose conversations were expected to be intercepted were not sufficiently named or identified. Although there is no evidence that Cataldi used the 333 Club or Gall telephones, Cataldi contends he has standing to attack the evidence obtained against him because they resulted from the earlier *586 wiretaps. Reliance is placed on N.J.S.A. 2A:156A-21(b), which provides that an "aggrieved party" may move to suppress "evidence derived" from an intercepted communication on grounds that "(b) The order of authorization is insufficient on its face."
Cataldi's conversation was intercepted in the Gall wiretap, and he comes within the definition of an aggrieved person. N.J.S.A. 2A:156A-2(k). Cf. United States v. King, 478 F.2d 494, 506 (9 Cir.1973). We need not discuss the question of the standing of the other defendants, however, because we are satisfied that the prior wiretap orders were not facially insufficient and were not so deficient as to warrant suppression of the evidence seized in this case.
First, we consider the Gall Wiretap order. Gall was named in the caption of the order issued on May 13, 1975. His relation to the proposed wiretap search was fully disclosed in the application. While the better practice would have been to name him in the body of the order as the object of the wiretap, together with other persons whose identity was unknown, we find sufficient compliance with N.J.S.A. 2A:156A-12(b) to repel this attack. Gall was literally named in the order; the caption included his name; and it was not known, although there was probable cause to believe, that Gall was the person using the telephone registered to him at the premises identified in the order.
Lastly, we consider the wiretap order for the telephones at the 333 Club. There was probable cause to believe that these telephones were used for illegal gambling activity. Defendants Cirillo, "Mickey" Lukach and an unindicted person named Latawiec had used the telephones there for suspected gambling purposes. The May 1, 1975 wiretap orders stated in their captions that they pertained to the "interception of wire communications of an individual known as Anthony J. Cirillo," and they identified the telephone facilities, although Cirillo was not again named in the body of the order. Lukach was not named in the order at all, although *587 he was observed using both telephones on April 17, once on April 19 and once on April 20, 1975.
In these circumstances the better practice would have been to name both Cirillo and Lukach in the body of the wiretap order. However, we do not find this omission fatal. The order clearly stated in its caption that it was directed toward the interception of Cirillo's conversations. His identity and relationship to the criminal activity were fully disclosed in the application, as required by N.J.S.A. 2A:156A-9. In these circumstances there was substantial compliance with the statute.
As for Lukach, it was not certain that his conversations would be intercepted from these telephones, nor were the telephones listed to him, or his firm, nor did he have an interest in the premises. His use of the telephones may have been anticipated, however. Because of this it would have been preferable to include Lukach's name in the order. However, his identity and activity were fully disclosed in the application, and he was not prejudiced in any way by this omission.
N.J.S.A. 2A:156A-16 mandates that a person named in the order or application shall be served with an "inventory" of certain information specified therein, including notice of the entry of the order and whether communications were intercepted during the authorized period. The court may thereafter allow inspection of the intercepted communications by the communicant or his attorney. Naming the person in the order serves another purpose. Each application must contain a "complete statement of the facts concerning all previous applications, known to the individual authorizing and to the individual making the application * * * involving any of the same facilities or places * * * or involving any person whose communication is to be intercepted * * *." N.J.S.A. 2A:156A-9(e) (emphasis added).
Admittedly it is unclear whether a person must be named because on several occasions he has used a telephone at *588 premises not under his control which is used by many people, as in the case of the telephones at the 333 Club. But where that person is a target of the investigation and his use of a telephone is expected, such as defendant Lukach, he should be named in the order as well as the application. This will facilitate compliance with N.J.S.A. 2A:156A-9(e) in case of future wiretap applications aimed at the same subject or subjects. Cf. United States v. Bellosi, 163 U.S. App. D.C. 273, 501 F.2d 833, 838-839 (1974), dealing with similar provisions in Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C.A. § 2510 et seq.
Here, as noted, the affidavits supporting the applications contained a full recital of the background information, were apparently made in good faith and named all persons who were possible subjects of the investigation. There is no complaint of noncompliance with any other provisions of N.J.S.A. 2A:156A-1 et seq. In the described circumstances the failure to name Cirillo, Lukach or Gall in the body of the orders, where all were named in the application and Cirillo and Gall were named in the caption of the orders, is not a deficiency which warrants suppression of the evidence. Cf. United States v. Civella, 533 F.2d 1395, 1404-1405 (8 Cir.1976); United States v. Doolittle, 507 F.2d 1368, 1371, adhered to on rehearing en banc, 518 F.2d 500 (5 Cir.1975). The suppression order entered in State v. Murphy, 137 N.J. Super. 404, 424-428 (Law Div. 1975), may be explained, in part, by the failure to name Murphy, the target of the wiretap, in the order and all extension orders and the failure to serve him with formal notice and an inventory as required by N.J.S.A. 2A:156A-16. This "insolence" of law enforcement officials was there found to violate the spirit of strict compliance with wiretap conditions deemed necessary to guard against "secret government surveillance." 137 N.J. Super. at 427-428. No such insolence has been demonstrated in the case before this *589 court. In fact, there is no suggestion that good faith was lacking.
On the premise that the wiretap orders were defective it is contended that evidence seized under the search warrants should be suppressed. The argument is that the information which caused the issuance of the search warrant was poisoned by having been secured through an illegal wiretap order. Since we have rejected the premise upon which this argument is based, we find no reason to invalidate the subsequent physical searches.
The order denying the motion to suppress is affirmed.
NOTES
[1] All defendants joined the brief filed by Cataldi supporting his motion for leave to appeal. With leave of court that brief was used on the appeal proper by all defendants. This circumstance explains the detail concerning Cataldi contained in this opinion.